```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X
                                           :       ECF CASE
CHARLES COLEMAN, et al.,                   :
                                           :       05 Civ. 6224 (WCC)
                  Plaintiffs,              :
                                           :
       - against -                         :       OPINION
                                           :       AND ORDER
BMC CONSTRUCTION CORP. and BENEDETTO       :
CUPO,                                      :
                                           :
                  Defendants.              :
                                           :
- - - - - - - - - - - - - - - - - - - - - X
```

**A P P E A R A N C E S :**

                         GRANIK SILVERMAN & HEKKER
                         **Attorneys for Plaintiffs**
                         254 South Main Street, Suite 516
                         New City, New York 10956

DAVID W. SILVERMAN, ESQ.

      Of Counsel


                         GREENE & ZINNER, P.C.
                         **Attorneys for Defendants**
                         202 Mamaroneck Avenue
                         White Plains, New York 10601

PAUL T. VINK, ESQ.

      Of Counsel

**Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiffs Charles Coleman, John J. Chiaffi, Richard O'Beirne and John T. Cooney, Jr. (collectively, "plaintiffs"), as Trustees of the Laborers Local Union 754 Health & Welfare Fund, Pension Fund, Savings Fund, Annuity Fund, Industry Advancement Fund, Dues Supplement Fund, LECET Fund, National Health and Safety Fund, 754 LECET Fund, Training Fund and Organizing Fund (collectively, the "Local 754 Funds"), bring this action under the Employee Retirement Income Security Act ("ERISA") to collect employee benefit contributions allegedly owed these funds from defendants BMC Construction Corporation ("BMC") and one of its executives, Benedetto Cupo, (collectively, "defendants").[1] The allegedly delinquent contributions arise out of work performed by Michael Grissom, a member of Laborers International Union of North America, Local 754 (the "Union"), as a purported contract employee of BMC and/or Cupo.[2] Plaintiffs now move for summary judgment under §§ 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, against BMC for failing to make contributions pursuant to a direct agreement and against Cupo as a fiduciary for failing to use trust fund assets for trust fund purposes.[3] For the reasons stated herein, plaintiffs' motion for summary judgment is denied.

---

[1] Plaintiffs also make the obligatory request for attorneys' fees, in this instance amounting to $8,040.00.

[2] Defendants' Answer asserted a counterclaim for $7,366.95.

[3] Plaintiffs' Complaint lists a cause of action under § 301 of the Labor Management Relations Act, but plaintiffs make no mention of this cause of action in their motion for summary judgment. While it appears that plaintiffs have abandoned this cause of action, the Court refrains from so ruling at this time.

## BACKGROUND

Grissom, a Union member, allegedly was employed by BMC to work on two Union-related construction projects by written agreement dated August 14, 2003 (the "Agreement"). (Pls. Rule 56.1 Stmt. ¶¶ 6-8.) The purpose of the Agreement was "to set forth the conditions under which certain employees of the Employer may participate or continue to participate in the [Local 754 Funds] Plan." (*Id.* ¶ 9; Dillon Aff., Ex. B; Cupo Aff., Ex. A.) A handwritten modification reading "For 2 projects '3 Rd. St. Imp.' 'Yale Dr. Reconstruction'" appears immediately after the last typewritten line of this section and includes handwritten initials in the margin. (Pls. Rule 56.1 Stmt. ¶ 9; Dillon Aff., Ex. B; Cupo Aff., Ex. A.) The handwritten language was, according to defendants, meant to limit participation in the Local 754 Funds to just two projects: the Third Street Improvement Project and the Yale Drive Reconstruction Project. (Cupo Aff. ¶ 3.) Plaintiffs claim the Agreement was entered into so that BMC could hire Grissom, an individual Union employee, without having to sign a collective bargaining agreement but that the Agreement was "solely referable to the collective bargaining agreement." (Dillon Aff. ¶ 4.) Defendants indicate they wanted to avoid signing a collective bargaining agreement because the majority of the jobs they perform are nonunion. (Cupo Aff. ¶ 4.)

The Agreement contains no termination date, but rather includes a termination provision stating: "This agreement may be terminated by either party with 30 days notice to the others prior to the effective date of termination. Such termination will not relieve the Employer from the obligation for contributions to the Plan incurred prior to the effective date of termination." (Dillon Aff., Ex. B; Cupo Aff., Ex A.)

Defendants claim that Grissom worked on these two projects from January 2004 until

roughly August 10, 2004. (Cupo Aff. ¶ 7.) BMC also was allegedly working on nonunion, residential jobs around August 2004, and BMC offered Grissom a position working on these jobs, allegedly with the caveat that these jobs were not covered by the Agreement and, therefore, not subject to Local 754 Funds contribution. (*Id.* ¶ 7.) Defendants claim that "[i]t was specifically understood by all parties that these were non-union jobs, and were not covered by the agreement with the benefit funds. BMC could not afford to hire Mr. Grissom as a union member on non-union residential jobs, the cost [was] simply too high." (*Id.*) Defendants assert that Grissom continued to work for BMC on nonunion jobs from August 11, 2004 to July 29, 2005. (*Id.* ¶ 12.) Grissom allegedly received the same salary for the nonunion jobs as he did for the two projects covered by the Agreement, albeit minus the Local 754 Funds' benefits. (*Id.* ¶ 13.) Plaintiffs, on the other hand, assert that no notice of termination was ever provided and that defendants continued to deduct monies meant for the Local 754 Funds from Grissom's pay. (Pls. Rule 56.1 Stmt. ¶ 13; Dillon Aff. ¶ 12.)

A primary issue in this action arises from the Union-preferred method by which employers contribute to benefit funds: the purchase of "stamps." (Cupo Aff. ¶ 8; Dillon Aff. ¶ 5.) The stamps are essentially credits reflecting the number of hours a Union employee works, and represent monies prepaid by employers to the Local 754 Funds. (Cupo Aff. ¶¶ 8-9; Dillon Aff. ¶ 5 & Ex. A.) These stamps are then delivered to the employee with his pay. (Dillon Aff. ¶ 5 & Ex. A.) Stamps can only be purchased by filling out an order form that contains language requiring the employer to acknowledge that the stamp purchase binds the employer to the collective bargaining agreement. (Dillon Aff., Ex. C.) In addition, the stamp purchase order expressly permits an employer to terminate participation in the Local 754 Funds on thirty days written notice to the Union. (*Id.*)

Plaintiffs state that defendants purchased stamps for contributions for the period October 31, 2004 through December 5, 2004. (Pls. Rule 56.1 Stmt. ¶ 12.) Defendants admit that stamps were purchased during this period, but that such purchases were the result of an accounting/management error.[4] (Defs. Rule 56.1 Stmt. ¶ 12; Cupo Aff. ¶¶ 12, 14.) This error allegedly resulted from the fact that defendants "simply forgot" that the Agreement was limited to only two projects, and continued to purchase stamps out of "habit." (Cupo Aff. ¶ 14.)

According to plaintiffs, the trust fund contribution rate was $15.30 per hour at the time BMC hired Grissom. (Dillon Aff. ¶ 8.) This rate increased to $16.85 "[p]ursuant to the agreement of April 1, 2005."[5] (*Id.*) This "included $3.40 per hour constituting dues checkoff, a savings plan, and other contributions which were tax includable to the employee and were deducted from his salary." (*Id.*) Plaintiffs assert that defendants did not remit any payment under the increased rate, including the $3.40 portion. (*Id.*) Defendants again assert that "an accounting oversight" occurred and that they accidentally deducted the $3.40 from Grissom's salary as "a matter of habit." (Cupo Aff. ¶ 14.)

Plaintiffs claim they made a demand for the contribution amounts, totaling $13,222.40, due the Local 754 Funds as a result of Grissom's work for the period of December 6, 2005 to April 27, 2005. (Pls. Rule 56.1 Stmt. ¶ 14.) Defendants issued a check, dated May 20, 2005, for the contributions, but subsequently stopped payment on the check. (*Id.* ¶ 15; Dillon Aff. ¶ 9 & Ex. D; Cupo Aff. ¶ 15.) Plaintiffs allege that they sent written notice regarding the stopped payment to

---

[4] Cupo's affidavit puts the dates of purchases between August 10, 2004 and December 5, 2005. (Cupo Aff. ¶ 14.)

[5] Plaintiffs refer to this April 1, 2005 agreement in Dillon's affidavit but do not further explain the agreement or who was a party to this agreement. It appears it may refer to an updated collective action agreement not provided to the Court.

BMC and proceeded with litigation after not receiving a "satisfactory response." (Dillon Aff. ¶ 10 & Ex. E.) In addition, plaintiffs allege that Grissom notified Cupo that unless the benefits were paid, Grissom could not continue to work for BMC. (Pls. Rule 56.1 Stmt. ¶ 16.) According to plaintiffs, Cupo "admitted that he didn't have the funds to cover the check issued on 5/20/05, and to 'let the lawyers work it out.'" (*Id.* (citing Grissom Aff.).) Defendants deny this conversation ever occurred. (Defs. Rule 56.1 Stmt. ¶ 16.)

Grissom continued to work for defendants from April 28, 2005 to July 15, 2005, during which time plaintiffs allege his benefits were paid by checks delivered directly to the Local 754 Funds' office.[6] (Pls. Rule 56.1 Stmt. ¶ 17.) However, plaintiffs claim that benefits for the period of July 16, 2005 to July 29, 2005, which comprised Grissom's last two weeks of employment with BMC, were never paid and that they therefore also are owed benefits in the amount of $1,348.00, bringing the alleged total benefit payment deficiency to $14,570.40. (*Id.* ¶¶ 18, 20.)

## DISCUSSION

### I. Standard of Review

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at

---

[6] Plaintiffs attached copies of these supposed check payments as Exhibit C to the Affidavit of Lynn Dillon, administrator of the Local 754 Funds. The Court notes that the single check attached is dated April 11, 2005 and indicates on the check's memo line that it is for stamp purchases through December 5, 2004.

248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**II.     Section 515 Claim**

According to § 515 of ERISA, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contribution in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. Section 515 was added to ERISA by Congress in 1980 in order to "'simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans.'" *Trustees of the Bricklayers & Allied Craftworkers v. Charles T. Driscoll Masonry Restoration Co.*, 165 F. Supp. 2d 502, 509 (S.D.N.Y. 2001) (quoting *Cent. States, S.E. & S.W. Areas Pension Fund v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1348 (8th Cir. 1990)). In furtherance of that aim, Congress created strict remedies supporting enforcement of § 515 "to give employers a strong incentive to honor their contractual obligations to contribute and to facilitate the collection of delinquent

accounts." *Laborers Health & Welfare Trust Fund for N. Cal. v. Advanced Lightweight Concrete, Co., Inc.*, 484 U.S. 539, 547-48 (1988). In addition to providing strict remedies, ERISA limits the defenses available to an employer being sued by an employee benefits plan. *See Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 314 (2d Cir. 1990). The only defenses available to an employer are: "(1) that the pension contributions themselves are illegal; and (2) that the collective bargaining agreement is void (not merely voidable)." *Trustees of the Bricklayers*, 165 F. Supp. 2d at 509.

"Of course, the benefit plan must prove that the employer promised to contribute to the plan in order to succeed on its claim." *Benson*, 907 F.2d at 313; *see also DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 653-54 (2d Cir. 1994) (clarifying limits of *Benson* by adopting Third Circuit statement in *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 138 (3d Cir. 1993), that plaintiffs "are not entitled to enforce a nonexistent contractual obligation"). Here, numerous genuine issues of material fact prevent plaintiffs from establishing that defendants intended to promise any contributions to the Local 754 Funds beyond Grissom's work on the Third Street Improvement and Yale Drive Reconstruction Projects, thereby mooting plaintiffs' reliance on *Benson*'s limitations. *See King v. Atlas Transit Mix Corp.*, Nos. 95 CV 1098 & 95 CV 1511, 1999 WL 1288943, at *2 (E.D.N.Y. Oct. 22, 1999).

The parties have produced a typewritten, signed Agreement containing a handwritten modification apparently limiting the scope of the Agreement to only those two projects. Yet plaintiffs have submitted an affidavit from Grissom stating that "[i]t was always agreed that my working for BMC Construction was subject to them paying my benefits" to the Local 754 Funds. In addition, plaintiffs insinuate that the handwritten limitation may be a post-hoc fabrication. (Pls.

7

Reply Mem. Supp. Mot. Summ. J. at 6.) In opposition, defendants have submitted an affidavit from Cupo stating that plaintiffs and Grissom were aware that his continued employment by BMC for work on other projects would be outside the Agreement. (Cupo Aff. ¶ 7.)

Plaintiffs also quote extensively from *Brown v. C. Volante Corp.*, 194 F.3d 351 (2d Cir. 1999), to support their position that defendants' actions manifested an intent to adopt an otherwise unsigned collective bargaining agreement. *Brown* is distinguishable from the facts of this case. In *Brown*, the employer acknowledged, in writing, its payment responsibility, made fund contributions for a three-year period and cooperated in an audit of the employer's records. *See* 194 F.3d at 353.

In the instant action defendants have submitted evidence that plaintiffs and Grissom were informed that future work was outside the scope of the Agreement and that continued payment to the Local 754 Funds was the result of an accounting error that it promptly rectified. Moreover, the Court notes that serious factual discrepancies exist between the dates of employment and so-called corresponding dates of payment. Unlike *Brown*, plaintiffs here have not satisfied their initial burden to demonstrate the absence of a genuine issue of material fact as to whether defendants adopted the collective bargaining agreement. Rather, plaintiffs offer only the uncorroborated statement of Grissom that Cupo acknowledged his need to pay benefits, which Cupo denies. Consequently, plaintiffs' motion for summary judgment must be denied.

### III. Section 3(21) Fiduciary Liability

Plaintiffs allege Cupo is liable for breach of fiduciary duty for failing to submit designated trust assets to the Local 754 Funds, effectively converting Grissom's earnings. ERISA states that "a fiduciary shall discharge his duties with respect to a plan . . . with the care, skill, prudence, and

8

diligence . . . that a prudent man . . . would use." 29 U.S.C. § 1104(a)(1), (a)(1)(B). "The statute provides that 'any person who is a fiduciary' and who breaches his fiduciary obligations 'shall be personally liable to make good to such plan any losses to the plan.'" *NYSA-ILA Med. & Clinical Servs. Fund v. Catucci*, 60 F. Supp. 2d 194, 203 (S.D.N.Y. 1999) (quoting 29 U.S.C. § 1109(a)).

However, a defendant can only have breached his fiduciary duties if he is in fact a fiduciary. ERISA states that a "'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." *Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996) (quoting 29 U.S.C. § 1002(21)(A)); *see also Frommert v. Conkright*, 433 F.3d 254, 271 (2d Cir. 2006). ERISA's definition of "fiduciary" is to be broadly construed. *See*, *e.g.*, *Frommert*, 433 F.3d at 271; *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987). "Unlike the common law definition under which fiduciary status is determined by virtue of the position a person holds, ERISA's definition is functional." *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (internal citation omitted).

Plaintiffs argue that because the contributions at issue became trust assets immediately upon being due, Cupo qualifies as a fiduciary under ERISA's broad definition and therefore is liable for the nonpayment. Typically, however, "an individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager." *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993). And while plaintiffs correctly note that courts in the Second Circuit have recognized individual liability for delinquent payments, generally "a corporate employer does not have a fiduciary obligation to make trust fund contributions, *see* 29 U.S.C. § 1002(21)(A) (defining

9

'fiduciary'), and a corporate officer's role in a company's failure to make such contributions is not automatically participation in a breach of fiduciary duties." *Sasso*, 985 F.2d at 51; *see also Burrowes v. Brookdale Hosp. & Med. Ctr.*, 66 Fed. Appx. 229, 232 (2d Cir. 2003).

To the extent liability may be imposed on an individual officer, shareholder or manager, the cases upon which plaintiffs rely concern clear obligations to contribute to a fund, *i.e.*, a signed collective bargaining agreement, and individuals with clearly established high levels of control over corporate assets where, by virtue of that control, they have breached their ERISA-imposed fiduciary duty by commingling otherwise earmarked funds to pay other creditors rather than contribute those monies to a fund. *See*, *e.g.*, *LoPresti*, 126 F.3d at 40-41; *Catucci*, 60 F. Supp. 2d at 201-03.

Here, however, the applicability of these cases is not clear. The parties dispute whether Cupo is the president or a vice president of BMC, therefore raising a question as to his level of control. In addition, plaintiffs allege that Cupo told Grissom he had not contributed to the Local 754 Funds because he lacked the money, raising possible accounting issues of the type found so crucial by other courts analyzing individual liability under ERISA. Yet plaintiffs have by no means definitively established Cupo's degree of control over company funds or the additional facts necessary to come under the case law upon which they rely. "Without more, these allegations do not meet the *LoPresti* standard," thus preventing summary judgment on this issue. *Trustees of ALA-Lithographic Indus. Pension Plan v. Quality Color Graphics, Inc.*, No. 99 Civ. 11795, 2001 WL 274266, at *4 (S.D.N.Y. Mar. 20, 2001).

It goes without saying, of course, that Cupo's potential liability rests in the first instance on whether BMC was in fact obligated to contribute to the Local 754 Funds.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for summary judgment is denied.

SO ORDERED.

Dated: White Plains, New York
       March 31, 2006

                                                          *[signature]*
                                           Sr. United States District Judge